UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
TELEBRANDS CORP.,

                    Plaintiff,                    **MEMORANDUM AND ORDER**

          - against -                            09 CV 1001 (NRB)

DEL LABORATORIES, INC., COTY US, LLC, and
COTY, INC.,

                    Defendants.
---------------------------------------X

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

     Plaintiff Telebrands Corp. ("Telebrands") commenced this
action against Del Laboratories, Inc., Coty US, LLC, and Coty,
Inc. (collectively, "Coty"), asserting claims for patent
infringement, registered trademark infringement, federal unfair
competition, copyright infringement, common law unfair
competition under New York law, and statutory unfair competition
under section 360-k of the New York General Business Law.   In
June 2010, this Court granted in part Coty's motion to dismiss,
dismissing all claims except a claim for patent infringement
under the Patent Act, 35 U.S.C. §§ 271, 289, and a claim for
registered trademark infringement under Section 32(1) of the
Lanham Act, 15 U.S.C. § 1114(1).

     Presently before the Court is Coty's motion for summary
judgment on the two remaining claims.   In its motion, Coty
contends that Telebrands has sought to protect functional

features of its foot file and, as a result, those features are not subject to protection under design patent or trademark law.

For the reasons stated herein, Coty's motion for summary judgment is denied.

## BACKGROUND

### I.   Factual Background

#### A.   The Ped Egg Foot File

Telebrands manufactures and sells a foot care implement known as the Ped Egg, which is a foot file designed to remove calluses and dead skin from a user's feet.[1]   (R. 56.1 ¶¶ 1-2.) Before introducing the Ped Egg, Telebrands sought to distribute the Microplane foot file, an oval-shaped, molded plastic foot file that was designed to remove calluses and dead skin with a metal rasp.   (R. 56.1 ¶ 4.)   Ultimately, Telebrands did not

---

[1] The facts recited herein are drawn from Coty's Statement of Material Facts pursuant to Local Civil Rule 56.1 ("R. 56.1"), dated February 16, 2011, the Declaration of Amr O. Aly in Support of Defendants' Motion for Summary Judgment ("Aly Decl."), dated February 16, 2011, the exhibits annexed thereto ("DX-xx"), plaintiff's counterstatement pursuant to Local Civil Rule 56.1 ("Counter R. 56.1"), dated March 21, 2011, the Declaration of Eric M. Eisenberg in Opposition to Plaintiff's Motion for Summary Judgment, dated March 21, 2011 ("Eisenberg Decl."), the exhibits thereto ("PX-xx"), the Reply Declaration of Lisa Pearson in Support of Defendants' Motion for Summary Judgment, dated April 11, 2011 ("Pearson Decl."), and the exhibits thereto ("DX-Rxx").

Pursuant to Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rules"), "each statement controverting any statement of material fact[] must be followed by citation to evidence which would be admissible[] as required by Fed. R. Civ. P. 56(c)." Local Rule 56.1(d). Where a party opposing a motion for summary judgment fails to specifically controvert a statement of material fact, the statement is "deemed to be admitted for the purposes of the motion." Local Rule 56.1(c); see also Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 312 (2d Cir. 2008). In arriving at these undisputed facts, we reject as insufficient conclusory or non-responsive objections.

distribute the Microplane; instead, it designed its own ovoid-shaped product, which it named the "Ped Egg."[2]  (R. 56.1 ¶ 5.) Telebrands introduced the Ped Egg in October 2007.  (R. 56.1 ¶ 2.)

The body of the Ped Egg has three separate components: (i) a base; (ii) a cartridge with a metal file; and (iii) a top bearing the Ped Egg design mark printed in blue ink.  (R. 56.1 ¶ 11.)  The base and the top have curvilinear outer edges, which meet to form a curved line when the product is assembled.  (R. 56.1 ¶ 11.)  The top of the Ped Egg serves as the handle when the foot file is in use.  (R. 56.1 ¶ 11.)  Additionally, when assembled, the Ped Egg is a symmetrical, elliptical ovoid shape. (R. 56.1 ¶ 6.)  Both the tapered shape of a chicken egg and the symmetrical ellipsoid are basic geometric forms.  (R. 56.1 ¶ 7.)

The plastic body of the Ped Egg is manufactured in Hong Kong using a process known as thermoset plastic injection

---

[2]  Throughout the record, there is some dispute concerning the proper characterization of the shape of the Ped Egg.  Telebrands itself adopts differing definitions of the shape of the foot file.  See, e.g., DX-1 ("[T]he product appears to be an egg, but in fact is an ovoid."); DX-45 ("In one embodiment, the handle has an ergonomic shape . . . One such shape is the egg or generally ovoid shape."); Counter R. 56.1 ¶ 5 ("Telebrands denies any inference from Coty's characterization of the Ped Egg foot file as 'generally ovoid.'"); Counter R. 56.1 ¶ 6 ("Telebrands denies any inference from Coty's characterization of the Ped Egg foot file as 'a symmetrical elliptical ovoid form.'").  We conclude that it is consistent with the record as a whole, including Telebrands' own representations, to characterize the shape of the Ped Egg as an "ovoid," a "symmetrical ovoid," a "symmetrical ellipsoid," or a "symmetrical elliptical ovoid form."

molding.[3]   (R. 56.1 ¶¶ 12, 14.)   The molded plastic body of the Ped Egg has been available for purchase in various colors, including white, black, purple, pink, and blue.  (R. 56.1 ¶ 8.)

### B.   The Pedi-Perfect Foot Care Set

In November 2008, Coty introduced the Sally Hansen Pedi-Perfect foot care set.  The Pedi-Perfect set includes a white plastic foot file, toenail clippers, and pink, foot-shaped toe spacers.  (R. 56.1 ¶ 16.)   The foot file consists of three components: (i) a cartridge with a metal file; (ii) a cartridge with a pink ceramic buffer; and (iii) a top bearing the Sally Hansen house mark molded in plastic.  (R. 56.1 ¶ 17.)   The top of the Pedi-Perfect has two molded finger indentions and serves as the handle of the foot file when the file is in use.  (R. 56.1 ¶¶ 17, 19.)   The buffer cartridge of the Pedi-Perfect foot file serves as the bottom of the foot file when it is assembled for storage.  (R. 56.1 ¶ 17.)   The buffer and the cartridges have flat outer edges.  (R. 56.1 ¶ 19.)

Like the Ped Egg, the plastic body of the Pedi-Perfect foot file is manufactured by thermoset injection molding.  (R. 56.1 ¶ 21.)  The molded plastic body of the Pedi-Perfect is available for purchase in white.  (R. 56.1 ¶¶ 16, 20.)

---

[3] Troika International ("Troika") is the Hong Kong-based manufacturer of the Ped Egg.  (R. 56.1 ¶ 12.)

### C.   Telebrands' Rights in the Ped Egg

Telebrands is the exclusive licensee of International Edge, an entity that owns the intellectual property rights in the Ped Egg.  (R. 56.1 ¶ 23.)  For the purpose of this motion, Coty does not dispute that Telebrands stands in the shoes of International Edge.  (R. 56.1 ¶ 23.)

International Edge possesses patent and trademark rights in the Ped Egg.  Specifically, International Edge obtained U.S. Trademark Reg. No. 3,633,750 for the configuration of the Ped Egg on June 9, 2009.  (R. 56.1 ¶ 24; DX-42 ("The mark consists of the configuration of a foot file implement, specifically, the entire implement.").)  The registered design is a drawing of the assembled handle and base of the Ped Egg.  (R. 56.1 ¶ 24.)  On July 21, 2009, International Edge obtained Design Patent No. D596,802 for "[t]he ornamental design for a foot microfile." (R. 56.1 ¶ 25; DX-43.)  Cooper & Dunham LLP ("Cooper & Dunham"), counsel for Telebrands in this action, represented International Edge in connection with the both the trademark and design patent applications.  (R. 56.1 ¶¶ 24, 25.)

On March 4, 2008, Cooper & Dunham filed a utility patent application for the claimed inventions embodied in the Ped Egg ("Application").  The Application was filed on behalf of A.J. Khubani ("Khubani"), the President of Telebrands, Jun Yang, an employee of Troika, and their assignee, International Edge.  (R.

56.1 ¶ 26.)    The Application discloses that the Ped Egg configuration has "an ergonomic design to increase comfort and prevent fatigue in the user's hand while the device is being used."  (R. 56.1 ¶ 27.)    Additionally, the Application discloses that:

> [i]n one embodiment, the handle 22 has an ergonomic shape such that the skin removing device 10 can be comfortably held by a user while removing skin with file 18.    In another embodiment, the skin removing device 10 is designed such that the handle 22 and the cover 30 have an ergonomic shape when connected so that the skin removing device 10 can be comfortably held by a user while removing skin with abrasive surface 34.    One such shape is the egg or generally ovoid shape shown in FIGs. 1-7.

(R. 56.1 ¶ 27.)

The U.S. Patent and Trademark Office ("PTO") issued a "Non-Final Rejection" of the Application on November 25, 2009.    In that correspondence, the PTO rejected all of the claims in the Application on multiple grounds, including on obviousness grounds.  (R. 56.1 ¶ 29.)

On February 1, 2010, Cooper & Dunham sent a communication to the PTO concerning the pending Application.    The correspondence stated that: "[a]pplicants [] note that one key aspect of the subject invention is that the skin removing device has an 'ergonomic shape' when the covers are connected so that the device can be 'comfortably held by a user' . . . ."  (R. 56.1

¶ 28.)  However, on March 17, 2010, the PTO issued a "Final Rejection," again concluding that all of the claims in the Application should be rejected on obviousness grounds. (R. 56.1 ¶ 29.)

Following the rejection of the Application, Khubani, the President of Telebrands, submitted a declaration to the PTO to demonstrate that the Ped Egg was a great commercial success. (R. 56.1 ¶ 30.)  Specifically, Khubani declared under penalty of perjury that one of the "key features [that is] [] a significant contributor to the success of the Ped Egg product" is "having an ergonomic or egg shape."  (R. 56.1 ¶ 31; DX-49.)  In his declaration, Khubani contends that because the Ped Egg has enjoyed great commercial success, a utility patent should issue notwithstanding the PTO's obviousness rejection.  (R. 56.1 ¶ 30.)

In August 2010, Cooper & Dunham submitted an amendment to the Application on behalf of its client, International Edge. That amendment included a request that all references to "ergonomics" be stricken from the Application. (R. 56.1 ¶ 32; DX-50.)  Thereafter, Cooper & Dunham submitted an Information Disclosure Statement, which disclosed potential prior art to the PTO.  Among the disclosed references are: various pumice stones, Silly Putty, L'eggs Hosiery, various cheese graters, and a "Pedicure Tool" by Avon Products Inc.  (R. 56.1 ¶ 33.)

To date, no patent has issued and the Application remains pending. (R. 56.1 ¶ 26.)

### D.    The Prevalence of the Ovoid Shape

The egg or ovoid shape has influenced the design of various products, including kitchenware, other houseware, pumice stones, hand soaps, egg timers, door knobs, darning eggs, computer mouses, and cheese graters that capture grated cheese in the curved lid. (R. 56.1 ¶¶ 35-41, 44.) The shape also appears as product packaging for Silly Putty and L'Eggs Hosiery. (R. 56.1 ¶ 42.) Coty contends that other foot files, such as the above-mentioned Microplane foot file and a product manufactured by Avon, are available in ovoid forms.[4] (R. 56.1 ¶ 43.)

According to Coty, ovoid shapes are often used for hand-held products such as those listed above because their shape fits easily in the human hand. (R. 56.1 ¶¶ 46-48.) Similarly, the packaging of the Ped Egg recites that the handle is "ergonomically designed to fit perfectly in the palm of your hand for easy and convenient use." (R. 56.1 ¶ 51; DX-38.) Telebrands' advertisements for the Ped Egg likewise explain that the foot file has an ergonomic and easy-to-hold design. (R. 56.1 ¶ 52; DX-39.)

---

[4] Telebrands disputes Coty's characterization of the Microplane and Avon devices as ovoid. (Counter R. 56.1 ¶ 43.)

Coty also asserts that the ovoid design of the various foot files and cheese graters facilitate the collection of debris and simplify the cleaning process.   (R. 56.1 ¶¶ 43, 49.)   Finally, Coty contends that the cross section of an ovoid is an oval, and foot care tools that predate the Ped Egg -- including paddle-shaped foot files and pumice stones -- employ oval planes that can be easily and comfortably manipulated around the human foot. (R. 56.1 ¶ 50.)

### E.   Manufacturing Ovoid-Shaped Products

As noted above, both the Ped Egg and the Pedi-Perfect foot file are manufactured using a process called injection molding. That process involves forcing heated plastic into a mold and cooling the plastic until it hardens.   (R. 56.1 ¶ 54.)   Coty's expert witness, Michael Lubov ("Lubov"), contends that molding ovoid-shaped objects is advantageous because: the mold is easy to create; heated plastic flows smoothly into the mold and cools evenly; the simple form results in fewer flawed products and less rejected output; and the final product has greater strength than other forms.   (R. 56.1 ¶¶ 54-56; DX-60; DX-61.)

### II.  Procedural History

Telebrands commenced this action against Coty in February 2009.   After Telebrands filed a number of amended pleadings, Coty filed a motion to dismiss.   On June 15, 2010, the Court granted in part Coty's motion to dismiss the third amended

complaint, denying the motion with respect to Coty's registered trademark and design patent infringement claims. <u>Telebrands Corp. v. Del Labs., Inc.</u>, 719 F. Supp. 2d 283 (S.D.N.Y. 2010).

In our June 15, 2010 Memorandum and Order, we limited discovery on the surviving claims to the issue of functionality. In so ruling, we reasoned that:

> [w]hile we find that functionality cannot be resolved on this motion, the issue of functionality will be dispositive for Telebrands' claims that survive summary judgment . . . Telebrands must establish that the relevant features of the Ped Egg are non-functional because a design patent protects only the ornamental, non-functional aspects of a device . . . [and because] with respect to Telebrands' registered trademark claim, the Lanham Act does not protect [] features that are functional.

<u>Id.</u> at 301.   In our ruling, we also criticized Telebrands' pattern of asserting inconsistent claims both within the instant case and before the PTO.   <u>Id.</u> at 299-301.   We thus directed Telebrands to identify the non-functional features of the Ped Egg design so that the parties could target discovery to those functions.   <u>Id.</u> at 301.

In response, Telebrands asserted that the Ped Egg is characterized by the following non-functional features: (a) a generally egg-shaped configuration, (b) a white color, and (c) a curved profile along the lower side edge.   (R. 56.1 ¶ 3; DX-1.)

Following discovery, Coty filed a motion for summary judgment on the dispositive issue of functionality.

<u>DISCUSSION</u>

I.    **Legal Standards**

A.    **Rule 56**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." <u>Scott v. Harris</u>, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); <u>see also</u> <u>Quarles v. Gen. Motors Corp.</u>, 758 F.2d 839, 840 (2d Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248.

On a motion for summary judgment, the initial burden rests with the moving party to make a prima facie showing that no material fact issues exist for trial. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 330-31, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  Once this showing is made, "[t]o defeat summary

judgment, the non-movant must produce specific facts" to rebut the movant's showing and to establish that there are material issues of fact requiring trial.  <u>Wright v. Coughlin</u>, 132 F.3d 133, 137 (2d Cir. 1998) (citing <u>Celotex</u>, 477 U.S. at 322).  In determining whether a genuine issue of material fact exists, a court must view the facts in the light most favorable to the non-moving party and make all reasonable inferences in that party's favor.  <u>See</u> <u>Fincher v. Depository Trust & Clearing Corp.</u>, 604 F.3d 712, 720 (2d Cir. 2010).

### B.   Design Patent Infringement

Determining whether a design patent has been infringed involves a two-step analysis: first, the court must construe the meaning and scope of the asserted claims; and second, the court must determine whether the accused device infringes the claims, as construed.  <u>See</u> <u>Solvay S.A. v. Honeywell Int'l, Inc.</u>, 622 F.3d 1367, 1379 (Fed. Cir. 2010) (citing <u>Markman v. Westview Instruments, Inc.</u>, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), <u>aff'd</u> 517 U.S. 370 (1996)); <u>see also</u> <u>Elmer v. ICC Fabricating</u>, 67 F.3d 1571, 1577 (Fed. Cir. 1995) (applying two-step analysis to claims of design patent infringement).[5]  However, a design

---

[5] Because the Federal Circuit has exclusive jurisdiction over patent cases, 28 U.S.C. § 1295, we apply the law of the Federal Circuit to the patent infringement claim.  By contrast, because the Federal Circuit does not have exclusive jurisdiction over claims arising under the Lanham Act, we apply Second Circuit law to the registered trademark infringement claim.  <u>See</u> <u>Flex-Foot, Inc. v. CRP, Inc.</u>, 238 F.3d 1362, 1365 (Fed. Cir. 2001) (noting that the Federal Circuit "will apply the law of the regional circuit to which the

patent will protect only "the non-functional aspects of an ornamental design as seen as a whole and as shown in the patent." Amini Innovation Corp. v. Anthony California, Inc., 439 F.3d 1365, 1370-71 (Fed. Cir. 2006) (quoting KeyStone Retaining Wall Sys., Inc. v. Westrock, Inc., 997 F.2d 1444, 1450 (Fed. Cir. 1993)).

The first step of the infringement analysis entails more than providing a verbal description of the design; rather, it includes "other issues that bear on the scope of the claim" such as "assessing and describing the effect of any representations that may have been made in the course of the prosecution history . . . and distinguishing between those features of the claimed design that are ornamental and those that are purely functional." See Egyptian Goddess, Inc. v. Swisa, Inc., 543 F.3d 665, 679-80 (Fed. Cir. 2008).[6]  The second step of the design patent infringement analysis involves comparing the patented and accused designs for visual similarity. See Elmer,

---

district court appeal normally lies unless the issue pertains to or is unique to patent law"); see also Famous Horse Inc. v. 5th Ave. Photo Inc., 624 F.3d 106 (2d Cir. 2010) (applying Second Circuit law to Lanham Act claims); Elmer, 67 F.3d at 1578 ("Because trade dress issues are not unique to the exclusive jurisdiction of the Federal Circuit, we defer to the law of the regional circuit in which the district court sits.").

[6] In Egyptian Goddess, the Federal Circuit clarified that claim construction in the utility patent and design patent contexts may differ. Egyptian Goddess, 543 F.3d at 679. Specifically, the court reasoned: "[w]hile this court has held that trial courts have a duty to conduct claim construction in design patent cases, as in utility patent cases, the court has not prescribed any particular form that the claim construction must take. To the contrary, the court has recognized that design patents typically are claimed as shown in drawings, and that claim construction is adapted accordingly. See id. (internal quotations and citations omitted).

67 F.3d at 1577.   "In analyzing visual similarity, 'where . . . a [patented] design is composed of functional as well as ornamental features, to prove infringement a patent owner must establish that an ordinary person would be deceived by reason of the common features in the claimed and accused designs which are ornamental."   Id.   (alterations   and   ellipses   in   original) (quoting Read Corp. v. Portec, Inc., 970 F.2d 816, 825 (Fed. Cir. 1992)); see also Oddzon Prods., Inc. v. Just Toys, Inc., 122 F.3d 1396, 1405 (Fed. Cir. 1997).   Thus, a court must identify the ornamental, non-functional aspects of a design in order to determine the scope of protection.   See Metrokane, Inc. v. Wine Enthusiast, 185 F. Supp. 2d 321, 326-27 (S.D.N.Y. 2002).

Under Federal Circuit law, an aspect of a design patent "is functional 'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article.'" Amini, 439 F.3d at 1371 (quoting Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 851 n.10 (1982)); see also Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 148 (1989) ("To qualify for protection, a design must present an aesthetically pleasing appearance that is not dictated by function alone, and must satisfy the other criteria of patentability."); Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc., 501 F.3d 1314, 1319 (Fed. Cir. 2007) ("If the design is dictated by performance of the article, then it is

14

judged to be functional and ineligible for design patent protection.").

A defendant is entitled to summary judgment on a design patent infringement claim where there is no genuine issue of material fact that the claimed design is functional. See, e.g., Seat Sack, Inc. v. Childcraft Educ. Corp., No. 07 Civ. 3344 (DFE), 2010 WL 245576, at *14 (S.D.N.Y. Jan. 22, 2010) (granting defendant's motion for summary judgment on design patent claim); Metrokane, 185 F. Supp. 2d at 327-28 (same).

### C.   Registered Trademark Infringement

To prevail on a trademark infringement claim pursuant to section 32(1) of the Lanham Act, 15 U.S.C. § 1114, a plaintiff must establish that: "(1) it has a valid mark that is entitled to protection under the Lanham Act; and that (2) the defendant used the mark, (3) in commerce, (4) in connection with the sale . . . or advertising of goods or services, (5) without the plaintiff's consent." 1-800 Contacts, Inc. v. WhenU.com, Inc., 414 F.3d 400, 406-07 (2d Cir. 2005) (internal citations and quotations omitted). In addition, the plaintiff must show that defendant's use of that mark "is likely to cause confusion . . . as to the affiliation, connection, or association of [defendant] with [plaintiff], or as to the origin, sponsorship, or approval of [the defendant's] goods, services, or commercial activities by [plaintiff]." Id. at 407 (alterations and ellipses in

15

original).   However, a product feature that is functional will not be protected under the Lanham Act.   See TrafFix Devices, Inc. v. Mktg. Displays, Inc., 532 U.S. 23, 29-32 (2001); Qualitex Co. v. Jacobson Prods. Co., 514 U.S. 159, 165 (1995); see also 15 U.S.C. §§ 1115(a), 1115(b)(8) (functionality is a statutory defense under trademark law).

Under Second Circuit law, "a product feature is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." Coach, Inc. v. We Care Trading Co., Inc., 67 F. App'x 626, 629 (2d Cir. 2002) (quoting TrafFix, 532 U.S. at 32), cert. denied 537 U.S. 1108 (2003); see also Qualitex, 514 U.S. at 165 (citing Inwood Labs., 456 U.S. at 850 n.10).   The Supreme Court of the United States has explained that the purpose of the functionality doctrine is to "prevent[] trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." Qualitex, 514 U.S. at 164.

If there is no genuine issue of material fact that the product features at issue are functional, a defendant is entitled to summary judgment on a trademark infringement claim. See, e.g., Malaco Leaf, AB v. Promotion in Motion, Inc., 287 F. Supp. 2d 355, 365-67 (S.D.N.Y. 2003) (granting defendants'

16

motion for summary judgment on trade dress claims); Henri Bendel, Inc. v. Sears, Roebuck & Co., 25 F. Supp. 2d 198, 201-03 (S.D.N.Y. 1998) (Chin, J.) (same); see also ERBE Elektromedizin GmbH v. Canady Tech. LLC, 629 F.3d 1278, 1287-91 (Fed. Cir. 2010) (affirming order granting defendants' motion for summary judgment on trade dress and registered trademark claims); Jay Franco & Sons, Inc. v. Franek, 615 F.3d 855, 861 (7th Cir. 2010) (affirming order granting defendants' motion for summary judgment on registered trademark claim).

### D.   Functionality

The parties agree that the inquiry applicable to both the design patent and registered trademark claims is whether the feature is "essential to the use or purpose of the article or if it affects the cost or quality of the article." TrafFix, 532 U.S. at 32 (trademark); Amini, 439 F.3d at 1371 (quoting Inwood Labs., 456 U.S. at 851) (design patent).   The parties likewise agree that when determining whether a particular feature is functional for the purpose of either design patent or trademark law, the court should apply the so-called Morton-Norwich factors to aid in the analysis.   See, e.g., In re Bose Corp., 476 F.3d 1331, 1336 (Fed. Cir. 2007) (citing In re Morton-Norwich Prods., Inc., 671 F.2d 1332, 1340-41 (C.C.P.A. 1982)); Valu Eng'g, Inc. v. Rexnord Corp., 278 F.3d 1268, 1276 (Fed. Cir. 2002) (same).

Thus, when applying the standards of TrafFix and Inwood Labs., the court should consider: "(1) the existence of a utility patent disclosing the utilitarian advantages of the design; (2) advertising materials in which the originator of the design touts the design's utilitarian advantages; (3) the availability to competitors of functionally equivalent designs; and (4) facts indicating that the design results in a comparatively simple or cheap method of manufacturing the product." Valu Eng'g, 278 F.3d at 1274 (quoting Morton-Norwich, 671 F.2d at 1340-41). Unfortunately, there is little authority concerning the way in which a court should weigh the four factors.

With these standards in mind, we turn to the record before us.

**II.  Application**

As noted above, Telebrands identified three purportedly non-functional elements of the Ped Egg design: (1) the generally egg-shaped configuration; (2) the white color; and (3) the curved profile along the lower side edge of the foot file. In its opposition papers, Telebrands expressly abandons its claim that the color white is a non-functional feature that is protected by its design patent or trademark.[7] (Memorandum of

---

[7] Telebrands now argues that the color white is not subject to protection under the design patent or the registered trademark, but is merely a part of the trade dress of the Ped Egg. According to Telebrands, it identified the

Plaintiff Telebrands Corp. in Opposition to Defendants' Motion for Summary Judgment ("P. Mem.") at 17-18; Counter R. 56.1 ¶ 8.) Additionally, Telebrands fails to address the curved profile along the lower side edge in its opposition to Coty's motion for summary judgment.[8]   Thus, in resolving this motion, we focus on whether the ovoid configuration of the Ped Egg is functional and therefore not subject to protection under a registered trademark or design patent.

In support of its position that the ovoid configuration of the Ped Egg is functional, Coty points to three utilitarian benefits of the configuration: (1) the ovoid shape fits "perfectly" in the hand; (2) the ovoid handle captures skin shavings and facilitates easy clean-up; and (3) the oval plane of the file is easy to manipulate around the contours of the

_____

color white as a non-functional feature because it was confused by the directive in this Court's June 15, 2010 Memorandum and Order. Telebrands' present argument rings hollow. Our previous opinion clearly directed Telebrands to identify the non-functional features of the Ped Egg that Telebrands sought to protect in connection with its surviving claims -- namely, its design patent and trademark infringement claims. We did not direct Telebrands to identify features that related only to claims that we dismissed in their entirety, such as the trade dress claim. More importantly, however, we expect that if a party is uncertain about a directive from this Court, it will request clarification of that directive before spending over a year engaging in costly discovery and briefing on an issue it later argues is not relevant.

[8] When asked at oral argument whether Telebrands had abandoned its claim concerning the lower side edge of the foot file, counsel for Telebrands responded that it had not abandoned its claim. (Transcript of Oral Argument, dated August 24, 2011 ("Tr.") at 26-28.) Specifically, when asked whether it agreed that Coty's Pedi-Perfect lacked a curved lower edge, Telebrands responded that the finger grips on the Pedi Perfect resemble the curved profile of the Ped Egg's lower side edge. Regardless of whether Telebrands has abandoned its claim concerning the curved lower edge, it is not necessary to analyze the functionality of this of this feature to resolve the motion.

human foot.  (See, e.g., Declaration of Richard Garzon in Support of Defendants' Motion for Summary Judgment, dated Feb. 15, 2011, ¶ 16.)  Coty contends that these benefits satisfy the TrafFix standard for functionality.  By contrast, Telebrands argues that functionality is not a dispositive issue and that Coty nevertheless failed to satisfy the TrafFix standard.

We need not devote significant time to Telebrands' threshold argument that functionality is not dispositive because, as discussed in detail above, registered trademarks and design patents do not protect functional product features.  See, e.g., TrafFix Devices, Inc. v. Mktg. Displays, Inc., 532 U.S. 23, 32 (2001); Amini Innovation Corp. v. Anthony California, Inc., 439 F.3d 1365, 1370-71 (Fed. Cir. 2006).  As a result, there is abundant support for the proposition that a court may grant summary judgment to a defendant on trademark or design patent infringement claims where a plaintiff seeks to protect functional features.  See, e.g., Jay Franco & Sons, Inc. v. Franek, 615 F.3d 855, 861 (7th Cir. 2010) (affirming order granting defendants' motion for summary judgment on registered trademark claim); Seat Sack, Inc. v. Childcraft Educ. Corp., No. 07 Civ. 3344 (DFE), 2010 WL 245576, at *14 (S.D.N.Y. Jan. 22, 2010) (granting defendant's motion for summary judgment on design patent claim); Malaco Leaf, AB v. Promotion in Motion,

20

<u>Inc.</u>, 287 F. Supp. 2d 355, 365-67 (S.D.N.Y. 2003) (granting defendants' motion for summary judgment on trade dress claims).

As discussed above, we use the <u>Morton Norwich</u> factors as an aid for conducting an inquiry into whether the ovoid shape of the Ped Egg is "essential to the use or purpose of the article or if it affects the cost or quality of the article." <u>TrafFix Devices</u>, 532 U.S. at 32; <u>Amini</u>, 439 F.3d at 1370-71.

First, we turn to the first <u>Morton-Norwich</u> factor -- namely, whether a utility patent discloses the utilitarian advantages of the design.  In the present context, Telebrands lacks a valid utility patent but it (or its exclusive licensor) has vigorously prosecuted an Application for a utility patent. As the Federal Circuit has made clear, a court may consider disclosures in a patent application as well as disclosures in a valid, existing patent.  <u>Valu Eng'g, Inc. v. Rexnord Corp.</u>, 278 F.3d 1268, 1279 (Fed. Cir. 2002) (holding that a utility patent application has "evidentiary significance for the statements and claims made in the patent application concerning the utilitarian advantages" of the product feature(s) at issue).  Thus, we conclude that the Application may have evidentiary value.

As discussed above, the Application contains unambiguous and repeated references to the functionality of the ovoid design. (<u>See, e.g.</u>, DX-45 at ¶ 13 ("A further objective of the present invention is to provide a skin removing device with an

ergonomic design to increase comfort and prevent fatigue in the
user's hand while the device is being used."); id. at ¶ 26 ("The
handle 22 may be shaped ergonomically to increase comfort and
decrease the fatigue caused by using conventional skin removal
devices."); id. at ¶ 30 ("[i]n one embodiment, the handle 22 has
an ergonomic shape such that the skin removing device 10 can be
comfortably held by a user while removing skin with file 18.").)
Indeed, the references to functionality appear in both the
patent specification and the claims. (DX-45 at ¶ 30 ("In
another embodiment, the skin removing device 10 is designed such
that the handle 22 and the cover 30 have an ergonomic shape when
connected so that the skin removing device 10 can be comfortably
held by a user while removing skin with abrasive surface 34.
One such shape is the egg or generally ovoid shape shown in
FIGs. 1-7."); id. at Claim 4 ("[What is claimed is: A device for
removing skin] wherein the ergonomic shape is an ovoid
shape.").)

    Additionally, the prosecution history includes repeated
disclosures concerning the functionality of the ovoid shape of
the Ped Egg. For example, in support of the utility patent
application, the President of Telebrands made a sworn statement
to the PTO that a key feature that contributed to the success of
the Ped Egg is its "ergonomic or egg-shape." (DX-49 at ¶ 7; see
also DX-48 at 8 (noting the applicants' argument that the

claimed inventions were not obvious because of their ergonomic
shape, which prevents fatigue during use).)  Notably, Telebrands
and International Edge made these representations to the PTO
during the same time frame that Telebrands argued before this
Court that the ovoid shape of the Ped Egg was decidedly non-
functional.

Telebrands not only made these representations to the PTO,
but the PTO accepted its position regarding the functionality of
the design.  Nevertheless, despite accepting the applicants'
position concerning functionality, the PTO rejected the
Application on obviousness grounds.  (DX-48 at 8 ("It is further
noted [by the applicants] that [the prior art] fail[s] to
disclose that this other cover has a domed surface so as to
comfortably fit in a user's hand . . . [The prior art] teaches a
cover . . . having a surface in the shape of a dome for the
hand.  Therefore, it would have been obvious to modify the
[prior art] with another cover of a domed shape to provide an
ergonomic shape that does not tire the user during use.").)

Telebrands responds that it only represented that the shape
was ergonomic and that "ergonomic" is not synonymous with
"functional," as evidenced by the fact that design patents have
been granted for "ergonomic" designs.  (PX-12.)  Although we
agree that the two terms are not synonymous, the record is clear
that Telebrands has gone beyond simply labeling the ovoid shape

as ergonomic and has promoted the functionality of the shape in its Application.   Indeed, the Application and the prosecution history are replete with admissions by Telebrands (or its exclusive licensor) that the shape has functional benefits, facts that are clearly relevant to this inquiry.   See Jay Franco, 615 F.3d at 859 ("[A] patent's invalidity for a reason other than uselessness says nothing about the claimed design's functionality.").   Thus, the statements made in the utility patent application disclose utilitarian advantages of the ovoid design.

Second, we address whether Telebrands' advertising touts the utilitarian advantages of the Ped Egg.   The Ped Egg packaging refers to the ergonomic design of the ovoid shape no fewer than four times.   (See, e.g., DX-38 ("Comfortable, Ergonomic Design."); id. ("The unique 'egg' shape of the Ped Egg not only looks great, but is ergonomically designed to fit perfectly into the palm of your hand for easy and convenient use.").)   Similarly, Telebrands' print, television, and internet advertisements publicize the "ergonomic," "easy," and "convenient" design of the Ped Egg.   (DX-39; DX-40; DX-41.)   In addition, Telebrands has continued to market the Ped Egg as ergonomic, even after it sought to expunge all references to ergonomics from its utility patent application. (DX-53 at 280-82.)   Accordingly, we agree that Coty made an initial showing

24

that the Ped Egg advertising touts the utilitarian advantages of the shape of the foot file.

Third, we consider whether functionally equivalent designs are available to competitors. Coty argues that, under TrafFix, once a product feature is found to be functional, "there is no need . . . to engage . . . in speculation about other design possibilities." 532 U.S. at 32. Thus, Coty contends, because the other Morton-Norwich factors counsel in favor of functionality, alternative designs need not be considered. In addition, Coty argues that the ovoid shape of the Ped Egg is one of a few superior designs as evidenced by the various pumice stones and paddle-shaped foot files on the market. (DX-33; DX-34; DX-35.) Telebrands counters that there is record evidence of multiple hand-held foot files in a variety of non-ovoid shapes that capture foot shavings. (See, e.g., PX-1; DX-37; DX-52.) We agree with Coty that the prevalence of the ovoid shape or similar shapes in foot care products provides some evidence of the superiority of the ovoid design. However, in light of the various alternatives in the market, we cannot find this factor to be dispositive.

Fourth, we turn to whether the design is a comparatively simple or cheap method of manufacturing a foot file. In support of Coty's argument that the ovoid shape confers manufacturing advantages over other shapes, Coty's expert attests that a

symmetrical ovoid shape is a superior form for injection molding. (DX-60; DX-61.) Specifically, Lubov maintains that it is relatively easy and less costly to make and maintain an ovoid mold. (<u>Id.</u>) In addition, he attests that the ovoid shape enables better plastic flow and more even cooling, resulting in fewer flawed products. (<u>Id.</u>)

In response, Telebrands contends that Coty failed to analyze actual data concerning manufacturing costs. In addition, it criticizes Lubov's testimony on the grounds that manufacturers frequently raise concerns that override simple cost considerations, resulting in the variety of injection-molded plastic products on the market that are not simple geometric forms.

We agree that the record concerning actual cost savings is not developed. However, we cannot fault Coty for the state of the record. During this litigation, Coty served discovery demands on Telebrands concerning the cost of manufacturing the Ped Egg. Yet Telebrands informed Coty that it had no documents that were responsive to Coty's discovery requests, that it would not accept service on behalf its Hong Kong-based manufacturer, Troika, and that it would not ask Troika if it would turn over responsive documents. (R. 56.1 ¶ 13; DX-58; PX-21.) Putting aside the issue of cost, it is undisputed that a shape such as an ovoid is a comparatively simple way to manufacture a plastic

foot file.  Thus, we agree that the fourth factor provides some support for a finding of functionality.

Thus, we conclude that Coty has satisfied its initial burden under Rule 56 of establishing that the relevant product features are functional.

Although Coty has carried its initial burden, Telebrands has produced specific facts that preclude the entry of summary judgment in favor of Coty.  Specifically, Telebrands has introduced evidence that:

- foot files that capture skin shavings are available on the market in various shapes, including in symmetrical and asymmetrical bean shapes, foot shapes, spheroids, flat-topped three-dimensional ovals, and bone or wand shapes (PX-1; DX-37; DX-52);

- when designing its foot file, Coty priced four product configurations and elected to produce an ovoid design that was more expensive on a per-unit basis than either a three-dimensional circular design or an ovoid design that opened via a side hinge (PX-18; PX-19);

- the cost of the ovoid mold for the Pedi-Perfect was the same as the cost of the mold for non-ovoid prototypes (PX-18);

- Coty considered putting a notch on the top of
  its foot file to provide for a better grip but
  abandoned that feature for aesthetic purposes
  (PX-2 at 125-26.)

Based on these facts, we cannot conclude that Coty has established on summary judgment that the ovoid design of the Ped Egg "is essential to the use or purpose of the article or . . . affects the cost or quality of the article." In sum, given the record before us and the lack of guidance concerning the relative weight of the Morton-Norwich factors, we cannot conclude that no reasonable jury would find the design at issue nonfunctional. However, it is also clear that a jury could weigh the facts in the record as it now stands and easily reach a conclusion that the claimed design is functional.[9]

In reaching the conclusion that this case is not resolvable on summary judgment, we do not wish to condone Telebrands' conduct during the course of the litigation. As we previously noted, Telebrands has advanced inconsistent arguments throughout this litigation and before the PTO as to the functionality of the design of its product. Although Telebrands' conduct does not quite give rise to judicial estoppel, we could easily reach a different outcome on this motion if we concluded that the

---

[9]  Additionally, it is uncertain how a jury would weigh Telebrands' inconsistent positions or the evidence that Coty sent images of the Ped Egg to its outside design team. (PX-3.)

doctrine applied to the instant facts.  <u>See</u> <u>DeRosa v. Nat'l</u> <u>Envelope Corp.</u>, 595 F.3d 99, 103 (2d Cir. 2010) (applying doctrine of judicial estoppel to sworn statements made to an administrative agency).

We also do not wish to excuse Telebrands' conduct during discovery.  As noted above, Telebrands identified at least one feature -- the color white -- that it knew was not relevant to the surviving claims.  Nevertheless, it made representations to the Court and to Coty that forced Coty to engage in costly discovery and briefing on that very issue.  Similarly, we cannot applaud Telebrands' unwillingness to reach out to its supplier to obtain cost data.

Thus, it should go without saying that we expect Telebrands to turn square corners during the remaining chapters of this litigation.

<u>**CONCLUSION**</u>

For the foregoing reasons, the motion (docket no. 40) is denied.  The parties shall appear telephonically for a status conference on October 4, 2011 at 2:30 p.m.

Dated:      New York, New York
            September 8, 2011

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE


Copies of the foregoing Order have been mailed on this date to
the following:

**Attorneys for Plaintiff**
Wendy E. Miller, Esq.
Norman H. Zivin, Esq.
Cooper & Dunham LLP
30 Rockefeller Plaza
New York, NY 10112

**Attorney for Defendant**
Amr O. Aly, Esq.
Lisa Pearson, Esq.
Kilpatrick Townsend & Stockton LLP
31 West 52nd Street, 14th Floor
New York, NY 10019